**ALEXANDER H. KERR & COMPANY, Inc., Plaintiff,**

v.

**B. T. FOOKS, Gulnare Fooks and Frances Sue Fooks, a partnership d/b/a Grapette Products Company; and The Grapette Company, Inc., Defendants.**

Civ. A. No. 716.

United States District Court
W. D. Arkansas, El Dorado Division.

Oct. 30, 1956.

Wood & Smith, Little Rock, Ark., for plaintiff.

L. W. Bower, Gaughan, McClellan & Laney, Camden, Ark., for defendants.

JOHN E. MILLER, District Judge.

## Statement

This case was tried to the Court, without a jury, on October 2, 1956, and at the conclusion of the trial the Court took the case under advisement in order to study the exhibits introduced by the parties. And now the Court, having considered the pleadings, ore tenus testimony of the witnesses, exhibits, and briefs of the parties, makes and files herein its findings of fact and conclusions of law, separately stated.

## Findings of Fact

### 1.

The plaintiff is a Nevada corporation. The defendants, B. T. Fooks, Gulnare Fooks, and Frances Sue Fooks are citizens of Arkansas and residents of the Western District of Arkansas, El Dorado Division, and are doing business as a partnership under the name Grapette Products Company. (Hereafter the Grapette Products Company will be referred to as the defendant.) The Grapette Company, Inc., is an Arkansas corporation doing business in the El Dorado Division of the Western District of Arkansas. The amount in controversy, exclusive of interest and costs, exceeds the sum of $3,000.

### 2.

After some preliminary negotiations, on December 31, 1952, the plaintiff entered into an agreement with defendant, said agreement being guaranteed by The Grapette Company, Inc., under which plaintiff agreed to sell to defendant thirty thousand gross of glass bottles manufactured especially for defendant, said bottles to be packed in labeled paper cartons. Among other things the contract provides:

"I.

"Sale of Goods

"The 'Seller' hereby agrees to sell to the 'Buyer' and the 'Buyer' hereby agrees to purchase from the 'Seller' thirty thousand (30,000) gross 'Clown' design bottles fourteen and seven-*eights* (14⅞) ounces in weight plus or minus one-half (½) ounce at the price of Seven Dollars and Nineteen Cents ($7.19) per gross packed in one dozen 'C' style cases; provided, however, if the 'Buyer' desires a bottom pad added, making this an 'L' style case, then in such event the price shall be Seven Dollars and Thirty-three cents ($7.33) per gross, packed in one dozen 'L' style cases.

"The prices quoted above are f.o.b. Camden, Arkansas.

"II.

"Delivery and Payment

"Delivery shall be made at Camden, Arkansas as follows:

"Ten thousand (10,000) gross on a 'make and ship' basis, payable net cash thirty (30) days or one percent (1%) cash discount in ten (10) days from date of each invoice, with Los Angeles exchange.

"The balance of this order or twenty thousand gross shall be ware-

housed by 'Seller' at its Sand Springs Oklahoma Warehouse up to July 15, 1953 at which time 'Buyer' agrees that it will have requested and taken delivery of said entire twenty thousand (20,000) gross. 'Seller' agrees to deliver entire amount (20,000) gross by July 15, 1953. If, however, the entire amount has not been produced by that date 'Buyer' may cancel such unmanufactured part, by notice in writing to 'Seller'. Billing times for said twenty thousand (20,000) gross shall be as follows: one-third (⅓) to be billed on May 20th, 1953, one-third (⅓) to be billed on June 20th, 1953, and the final one-third (⅓) to be billed on July 20th, 1953."

Initial production did not begin until the molds for the bottles were received, and apparently the first bottles were produced on March 21, 1953 (plaintiff's Exhibit No. 2). Thereafter plaintiff continued to produce the bottles under the contract.

On May 6, 1953, defendant placed an additional order with plaintiff for 20,000 gross of clown-design bottles. On June 23, 1953, defendant ordered 5,000 empty cartons from plaintiff to be used in replacing cartons that had been damaged in shipment, storage, etc. On June 26, 1953, plaintiff acknowledged the order for 5,000 cartons, stating that "We have placed an order with our box supplier for cartons to be delivered Monday, June 29." These cartons were ordered by plaintiff from Southwest Box Company on June 25, 1953 (plaintiff's Exhibit 2–A), and apparently were delivered to plaintiff on July 1, 1953, along with another order of 23,000 cartons from Southwest Box Company (plaintiff's Exhibit 2 indicates receipt of 28,123 cartons on July 1, and plaintiff's Exhibit 2 indicates that plaintiff had requested shipment from Southwest Box Company of the 5,000 cartons on June 29 and also 23,000 cartons on July 1). It appears from plaintiff's Exhibit 2 that these two orders were both filled on July 1.

However, for some unexplained reason only 2,500 of these cartons were shipped by plaintiff to defendant. In this connection, plaintiff's Exhibit 2 shows the shipment of these cartons (see lower right-hand corner of page 2 of the Exhibit), but the exhibit does not show the date on which the shipment was made.

On July 13, 1953, at 9:32 a.m., defendant sent plaintiff the following telegram: "Stop manufacture Grapette Products clown bottles until further notice. Advise Western Union inventory glass on hand. Our warehouses are full."

On July 14 defendant sent plaintiff the following telegram: "Do not ship bottles until further notice. Our warehouses and plant completely filled. No place to unload. Situation should be alleviated in week or ten days. You will be advised." On the same day, Dolphus McCord, plaintiff's Sales Representative, contacted Mr. B. T. Fooks, partner and General Manager of defendant, and informed him of the balance of cartons and bottles which plaintiff had on hand. Fooks informed McCord that the situation would be alleviated in a short time.

On August 7, 1953, M. R. Kerr, Vice President of plaintiff corporation, wrote Mr. Fooks as follows:

"We wish to review our initial order status with your good company. On July 13, our Oklahoma plant received the following wire and we quote:

" 'Stop manufacture Grapette Clown bottle until further notice. Advise warehouse inventory glass on hand.'

"Our Mr. R. F. Kalbus 'phoned you and gave you a preliminary analysis of our stock on hand and material inventory position; then our Mr. D. W. McCord made a trip into Camden to discuss your situation and await further instructions.

"A correct analysis of the balance remaining to be shipped against the original contract shows that, as of August 1, there is an open balance of 9691 gross yet to be delivered under

this contract. We have stock on hand, of filled glass, of 1381 gross and packing supplies on hand that would bring this up to approximately 6,000 gross.

"We were advised by Mr. McCord, after his personal visit to Camden, that this total quantity of 6,000 gross should be sufficient stock to meet the glass requirements of your company through the month of September along with the glass that you now have on hand.

"We were advised that you were going to analyze your production, sales and stock on hand and would then advise us of your findings so that we may intelligently schedule production and have ample stock on hand to meet your requirements as a result of this analysis. Therefore, we would appreciate your advising us of the results of this analysis if it has already been made. If there is any additional information that we can supply you that will assist you in making this analysis please do not hesitate to contact the writer.

"May we express our appreciation for the opportunity of doing business with you and looking forward to being of further assistance, we are"

On August 15, 1953, McCord talked to Fooks regarding a complaint on some over-sized bottles, and also discussed the possibility of filling the empty cartons.

On August 28, 1953, Mr. Fooks wrote to plaintiff explaining the difficulties defendant had experienced in estimating the amount of raw material inventory to be carried and in estimating the volume of business to be expected. After explaining some of the problems incurred by defendant, Fooks stated:

"The foregoing information has been given you so that you might be familiar with our operation due to the request which we are making of you as follows:

"Our present account with you amounts to $14,007.46, also the amount of 1,381 gross of glass which

you have on hand at your factory at $7.33 amounting to $10,122.73 which, when shipped, will reflect a balance due you of $24,130.19.

"We will be glad to make payment of $9,130.19 immediately provided you are willing to carry the amount of $15,000.00 on trade acceptance without interest or on open account until May 1st, in which event we will begin the removal of the 1,381 gross of glass which you have on hand immediately.

"We do not have room to store this glass, but will go to the expense of leasing another building to store glass from your factory if proposition submitted is satisfactory.

"We dislike making such a request, but the condition as set out above was beyond our control. We believe that the volume business given your company in the past and the future business you will receive, *justifys* your favorable consideration of this request."

On September 10, Kerr replied to Fooks' letter, stating, inter alia:

"The matter has been analyzed and gone into very carefully, and we find that we will be able to handle the matter on a basis of your remitting at this time for the past due amount of $14,007.47 with the balance of $10,122.73 to be covered by a trade acceptance due May 1, 1954, without interest, and with the understanding, as stated in your letter of August 28, that on receipt of your remittance and the trade acceptance we will make shipment of the ware in storage at our factory.

"Will look forward to your advising that you will handle as outlined above, and to receiving your remittance and trade acceptance."

On September 14, Fooks replied to Kerr's letter of September 10 as follows:

"I have your letter of September 10th and if you will issue type of trade acceptance desired, forwarding to us for our signature, it will be

returned with check to the amount of $14,007.47 covering present account.

"Our trucks will immediately begin picking up glass at your factory when this is done and the entire amount, which you say amounts to $10,122.73, will be removed."

On October 14, 1953, Kerr wrote Fooks as follows:

"We wish to acknowledge and thank you for your check in the amount of $13,124.67 and also for the Trade Acceptance which you accepted and signed for $10,122.73 and which will become payable on May 1, 1954."

On October 27, 1953, plaintiff's Executive Vice President, F. G. Kyle, wrote Fooks and enclosed a check for $992.63 in payment of a credit due defendant for freight allowances on items picked up by defendant's truck.

On December 1, 1953, defendant sent the following telegram to plaintiff: "Auditors are making annual audit of our books. Please wire collect any balance due on open account or on notes".

On the same day plaintiff replied by telegram as follows: "We hold trade acceptance for $10,122.73 due May 1, 1954, accepted on September 23, 1953, by The Grapette Company."

On December 30, McCord visited Camden and discussed with Fooks the coming year's production, especially with reference to filling the empty cartons.

On February 3, 1954, Kerr wrote Fooks as follows:

"We sincerely hope that your winter and spring promotional plans have developed to the point where you will be ready to place early glass manufacturing and shipping instructions.

"Anticipating the success of your plans, we wish to acquaint you again with the printed Grapette carton stock we have on hand for your account, as per the agreement of December 31, 1952. We recently took a physical inventory and find that we have 78,000 cartons complete with inner packing. These supplies were purchased and were on hand prior to your 'stop manufacture' instructions given in 1953.

"In order to coordinate your plans with our next three months production scheduling, we would appreciate your early advice as to the quantities you are desirous of our manufacturing and shipping to your goodselves. In terms of gross, the 78,000 cartons are the equivalent of 6,500 gross.

"An early reply will allow us to properly anticipate your requirements, and permit us to render the service you are desirous of having."

On February 22, Fooks replied as follows:

"In response to yours of February 3rd, I am unable to tell you just when we will need further shipment of glass, as we have not as yet disposed of all of the product that we had on the market and in storage, neither have we filled the 350,000 cases of surplus bottles that we had on hand.

"We believe that it will be around May 1st before all of this product is disposed of, but will keep you advised as to the exact date we will need more glass."

On April 5, McCord again talked to Fooks and was advised by him that defendant would probably take some more bottles in 45 to 60 days.

On May 4, 1954, defendant by check paid the $10,122.73 due on the trade acceptance.

On May 24, McCord contacted Fooks and was advised that plaintiff should have production shortly.

On June 7, 1954, Kerr wrote Fooks calling his attention to the fact that plaintiff still had on hand the 78,000 cartons, and stating that plaintiff was desirous of producing clown bottles to fill up the cases and to ship the same to defendant. On June 9, Fooks answered Kerr's letter of June 7, stating that defendant hoped to be in a position to purchase additional glass during the summer

and plaintiff would be informed by defendant when it was in a position to use more glass.

On June 19, McCord again talked to Fooks about the empty cartons and Fooks said that he hoped to have some movement shortly, although chances were not as good as in 1953.

On July 14, McCord again contacted Fooks and was advised that prospects were poor regarding the year's sales of clown bottles.

On July 22, 1954, Kerr wrote Fooks advising that plaintiff had on hand the 78,000 cartons, and it appearing that defendant would not purchase any glass during the year, that it was necessary for plaintiff to request payment for the 78,000 cartons. Plaintiff enclosed an invoice for payment of the cartons at plaintiff's actual cost, $115.42 per thousand, making the total sum $9,002.76.

Defendant did not reply to the letter of July 22, and Kerr again wrote Fooks on August 26.

On September 23, 1954, a final letter was written to Fooks by F. G. Kyle on behalf of plaintiff. This letter explained plaintiff's claim with regard to the 78,000 cartons.

### 3.

In the early part of 1953 defendant was urgently in need of bottles, and it purchased bottles from several other companies in addition to plaintiff. Fooks discussed with McCord the need for early production of bottles, and McCord advised him that the matter depended upon the plaintiff getting the molds. At the time of receiving notice to stop production on July 13, 1953, plaintiff had produced approximately 21,300 gross of bottles under the contract, which called for a total of 30,000 gross. An additional 403 gross was produced on July 14 and 15, making the total production about 21,700 gross and leaving 8,300 to be produced under the contract.

### 4.

In planning its production, plaintiff sought to coordinate the ordering of its supplies in an effort to obtain the maximum production. The cardboard boxes or cartons which were used by plaintiff were especially manufactured for use in fulfilling the contract with the defendant. Each box or carton would hold 12 bottles of syrup, and the cartons had particular designs with defendant's name thereon.

Plaintiff did not manufacture the boxes but purchased them from the Southwest Box Company and the Container Corporation of America at a cost of $115.42 per thousand.

Plaintiff's Exhibit 2–A discloses the dates on which plaintiff placed each of its orders for boxes, and also the dates on which plaintiff requested delivery. An analysis of this exhibit discloses that 39,000 cartons were ordered to be delivered in March; 96,000 to be delivered in April; 48,000 to be delivered in May; 63,000 to be delivered in June; and 144,000 to be delivered in July. Thus, a total of 390,000 cartons were ordered by plaintiff.

When plaintiff received the notice to stop manufacture on July 13, it contacted the box companies and canceled some of its orders for cartons. At that time 25,000 additional cartons were in transit, and plaintiff received these cartons on July 16, 1953. An additional 24,914 cartons were received by plaintiff on September 24, 1953.

After the stop order was given and plaintiff had placed the bottles it had manufactured in cases, plaintiff had on hand 78,000 "L" style cases for use in fulfilling its contract with defendant. Plaintiff still has these cases in its possession.

### 5.

Plaintiff operated its business on a 24-hour schedule. An analysis of plaintiff's Exhibit 2 discloses that in the month of April 1953 plaintiff operated 20 days and produced an average of 292 gross of bottles per day. In May plaintiff operated 18 days and produced an average of 322 gross; in June plaintiff operated 18 days and produced an average of 291 gross; in July, up to and including the 13th,

plaintiff operated 10 days and produced an average of 269 gross.

On July 14, 1953, plaintiff produced 287 gross of bottles, and on July 15 plaintiff produced 116 gross (the above are round figures, since the Court did not take into account fractional parts of a gross produced on any one day).

### 6.

Instead of making payments in accordance with the contract, defendant paid for the bottles on individual invoices. Plaintiff made no complaint to defendant concerning the manner in which defendant made payments.

### 7.

The telegram of July 13, 1953, was not intended by defendant to be a cancellation of the contract, and, in fact, defendant never explicitly canceled said contract.

### 8.

Plaintiff assumed that it would be permitted to manufacture the entire 30,000 gross of bottles, and it acted accordingly in continuing to purchase cartons in which to place the bottles.

### Discussion

As an affirmative defense the defendant asserts that an accord and satisfaction, or a novation, was entered into between the parties, thus barring recovery by the plaintiff in the instant case.

In Heller v. Mattar, D.C.W.D.Ark., 135 F.Supp. 767, 772, the court considered the question of novation under the Arkansas law, and quoted the following from the case of Cockrill v. Johnson, 28 Ark. 193:

" 'In the substitution of a new debt or obligation for an old one, which is denominated in the civil law a novation, the intention of the parties to that effect should be positively declared; or at least in whatever manner expressed it should be so evident as not to admit of a doubt; in other words, a novation is not to be presumed unless the intention to that effect evidently appears.' "

In the instant case there was no new obligation substituted for an old one,

and certainly there was no express or implied intention on the part of the plaintiff to make such a substitution. Therefore, defendant's contention that there was a novation cannot be sustained.

In De Soto Life Insurance Co. v. Jeffett, 210 Ark. 371, 377, 196 S.W.2d 243, 246, the court said:

"It is held generally that the payment of a liquidated, undisputed, matured obligation does not furnish a consideration for the release of any additional obligation. In 1 C.J.S., Accord and Satisfaction, § 29, it is said: 'The payment of a sum admittedly due and payable furnishes no consideration for the discharge of an additional and distinct amount or item of liability, and does not effect an accord and satisfaction thereof.' "

And in McMillan v. Palmer, 198 Ark. 805, 812, 131 S.W.2d 943, 947, the court said:

"We summarize our conclusions as follows: In accord and satisfaction there are certain elements that must usually or ordinarily be considered. First, there is a disputed amount involved. Second, there is a consent to accept less than the claimed amount in settlement of the whole. In this case there was no dispute. There was an actual agreement upon the amount that should be paid."

From the foregoing authorities it is apparent that before an accord and satisfaction can be established there must be a disputed amount involved, and the mere payment of a liquidated, undisputed, matured obligation does not furnish a consideration for the discharge of an additional and distinct liability. In the instant case there was no dispute as to the amount owed by defendant to plaintiff for the bottles which had been produced, and an agreement by defendant to pay the amount owed for the bottles would not furnish a consideration which would support an accord and satisfaction. Thus, defendant's contention that there was an accord and satisfaction is without merit.

In passing it might be noted that the Court has cited Arkansas cases on the question of novation and accord and satisfaction, but the rules stated are of such general application that the Court may safely assume that the California law is in accord with the Arkansas law in this regard. (The contract provides that the California law shall apply.)

There remain two primary questions. First, did defendant breach the contract? Second, if so, what is the amount of damages plaintiff is entitled to recover?

The contract in question was essentially a contract whereby plaintiff agreed to sell to defendant 30,000 gross clown-design bottles, packed in "L" style cases. Ten thousand gross were to be delivered on a "make-and-ship basis". The balance of 20,000 gross was to be delivered by July 15, 1953. The contract further provided that "If, however, the entire amount has not been produced by that date 'Buyer' may cancel such unmanufactured part, by notice in writing to 'Seller' ". It is evident that the expected completion date for the contract was July 15, 1953, and that if the entire amount was not produced by that date the defendant could cancel the unmanufactured part of the contract. It is further evident that the contract was intended to continue in effect past the date of July 15 unless it was canceled by defendant.

■ The action of defendant in stopping manufacture of the bottles on July 13, 1953, was a breach of the contract on defendant's part. However, there are two reasons which prevent plaintiff from taking advantage of this breach. In the first place, plaintiff's Exhibit No. 2 shows that plaintiff continued to manufacture the bottles until July 15, 1953, thereby waiving defendant's breach. Secondly, it would have been impossible for plaintiff to fully perform its part of the contract by July 15, and thus it was in no position at that time to complain of plaintiff's breach.

■ But, as above stated, the contract was not intended to expire on July 15, 1953, unless the defendant canceled the contract at that time. In the absence of a cancellation on the part of the defendant, defendant would have a reasonable time in which to request and take delivery of the remaining bottles under the contract. Compare, J. B. Beaird Co., Inc. v. Consumers Cooperative Ass'n, D.C.Mo., 102 F.Supp. 193. The defendant at no time canceled the contract. In its telegram of July 14, 1953, defendant merely requested plaintiff not to ship bottles until further notice, and defendant further stated that the situation should be alleviated in a week or ten days.

■ For the next year defendant's agents continued to advise plaintiff that additional bottles would probably be needed within a short time, and it was not until July 14, 1954, that Fooks finally advised plaintiff's Sales Representative, Mr. McCord, that prospects were poor regarding the year's sale of clown bottles. During all this time plaintiff was ready, willing, and able to perform its part of the contract within a reasonable time. Therefore, defendant's failure to permit production and to accept delivery of the remaining bottles within a reasonable time —together with its failure to exercise its right of canceling the contract—constituted a breach of the contract for which plaintiff is entitled to recover its damages.

Compare, J. B. Beaird Co., Inc., v. Consumers Cooperative Ass'n, supra.

Plaintiff contends that its measure of damages is governed by Section 63 of the Uniform Sales Act, while defendant contends that Section 64 of the Act applies. The Uniform Sales Act has been adopted in both California and Arkansas, West's Ann.Civ.Code, § 1721 et seq., Ark.Stats. § 68–1401 et seq. Section 63 of the Act provides, inter alia:

> "Although the property in the goods has not passed, if they cannot readily be resold for a reasonable price, and if the provisions of section 64(4) are not applicable, the seller may offer to deliver the goods

512

to the buyer, and, if the buyer refuses to receive them, may notify the buyer that the goods are thereafter held by the seller as bailee for the buyer. Thereafter the seller may treat the goods as the buyer's and may maintain an action for the price."

It is apparent that Section 63(3) is not applicable if Section 64 applies. The latter section provides:

"(1) Where the buyer wrongfully neglects or refuses to accept and pay for the goods, the seller may maintain an action against him for damages for non-acceptance.

"(2) The measure of damages is the estimated loss directly and naturally resulting, in the ordinary course of events, from the buyer's breach of contract.

&ast; &ast; &ast; &ast; &ast;

"(4) If, while labor or expense of material amount are necessary on the part of the seller to enable him to fulfill his obligations under the contract to sell or the sale, the buyer repudiates the contract or the sale, or notifies the seller to proceed no further therewith, the buyer shall be liable to the seller for no greater damages than the seller would have suffered if he did nothing towards carrying out the contract or the sale after receiving notice of the buyer's repudiation or countermand. The profit the seller would have made if the contract or the sale had been fully performed shall be considered in estimating such damages."

■ Plaintiff contends that the cases were an integral part of the order, and that the cases were manufactured at the time of the breach, i. e., that no labor or expense was necessary to complete the cases. The Court agrees that the cases were an integral part of the order, but it does not follow that Section 63 of the Uniform Sales Act should apply in the instant action. The order here was for 30,000 gross clown-design bottles, packed in "L" style cases. The price provided in the contract was $7.33 per gross. No sep-

arate price was specified for bottles or for cases, and it is clear that the bottles and cases were intended to be treated as units. Stated differently, in order to fulfill its obligations under the contract the plaintiff could not ship empty cases to the defendant. And, thus, it is quite evident that additional labor and expense of material amount would be necessary on the part of the plaintiff to produce the necessary bottles with which to fill the cases and thereby fulfill its obligation under the contract. It follows that the measure of damages is governed by Section 64 of the Sales Act rather than Section 63.

■■ Both under the Sales Act and under the general law, when a buyer breaches a contract and there is no market value for the goods in question the measure of damages is the difference between the contract price and the cost of producing the goods in question and delivering them in accordance with the contract. See, Annotations, 108 A.L.R. 1482, 1491; 44 A.L.R. 215, 251. In other words, the measure of damages is the seller's loss of profits, but in addition to loss of profits the seller may also recover actual losses incurred in a fair and reasonable effort to perform the contract, such as "payments for labor and material, reasonably made in part performance of the contract, to the extent that they are wasted if performance is abandoned." Lieberman v. Templar Motor Co., 236 N.Y. 139, 140 N.E. 222, at page 225, 29 A.L.R. 1089, at page 1095. See, also, Templar Motors Co. v. Bay State Pump Co., 6 Cir., 289 F. 24.

One of the landmark cases is United States v. Behan, 110 U.S. 338, 344, 345, 4 S.Ct. 81, 83, 28 L.Ed. 168, wherein the court said:

"Unless there is some artificial rule of law which has taken the place of natural justice in relation to the measure of damages, it would seem to be quite clear that the claimant ought at least to be made whole for his losses and expenditures. So far as appears, they were incurred in the fair endeavor to perform the contract which he assumed. If they

were foolishly or unreasonably incurred, the government should have proven this fact. It will not be presumed. The court finds that his expenditures were reasonable. The claimant might also have recovered the profits of the contract if he had proven that any direct, as distinguished from speculative, profits would have been realized. But this he failed to do; and the court below very properly restricted its award of damages to his actual expenditures and losses.

&ast;  &ast;  &ast;  &ast;  &ast;

"As before stated, the primary measure of damages is the amount of the party's loss; and this loss, as we have seen, may consist of two heads or classes of damage—actual outlay and anticipated profits. But failure to prove profits will not prevent the party from recovering his losses for actual outlay and expenditure."

In the instant case plaintiff made no attempt to prove any loss of profits, and thus plaintiff's measure of damages is the loss directly and naturally resulting from defendant's breach of the contract.

In the final analysis, plaintiff is entitled to recover for the expenditures it reasonably made in a fair endeavor to perform the contract. In this connection, plaintiff contends that it had on hand 78,000 cases which were reasonably necessary for its performance of the contract. On the other hand, defendant contends that plaintiff should have anticipated that the contract might be canceled on July 15, and that defendant should not be charged with the large number of cases plaintiff had on hand.

Of the 78,000 cases plaintiff now has on hand, 25,000 were in transit on July 13, 1953, and were received by plaintiff on July 16, 1953. An additional amount of 24,914 cases was not received by plaintiff until September 24, 1953 (see page 3 of plaintiff's Exhibit No. 2), which was more than two months after the stop-production order. Kerr testified that the 24,914 cases were already in the process of being manufactured on July 13, 1953,

when the stop order was given. His testimony was evidently based on a telephone call made by him to the company manufacturing the cases. Page 2 of plaintiff's Exhibit 2–A contains a statement "In process of manufacture 7–18–53 —24,000". No explanation was given about the statement concerning the 24,-000 cases in the process of being manufactured July 18 (instead of July 13), and no explanation was given as to why the 24,914 cases were not received until September 24 if they had in fact been in the process of manufacture on July 13. In view of these unexplained circumstances in addition to the fact that Kerr's testimony was apparently based on hearsay, the Court is convinced that plaintiff has failed to establish that the 24,914 cases were actually in the process of manufacture at the time of the stop order on July 13, 1953.

An additional reason exists for denying plaintiff recovery for the 24,914 cases. As above stated, plaintiff had the right to have on hand a reasonable number of cases in fulfilling its contract. In this connection, Kerr testified that ordinarily it was necessary to keep two to three weeks' supply of cases on hand. When the 24,914 cases are excluded plaintiff would have on hand 53,086 cases, which would have been enough to hold approximately three weeks' production of bottles. The Court is of the opinion that three weeks' supply of cases is the maximum amount that plaintiff could reasonably have on hand in the performance of the contract, particularly in view of the fact that defendant had the right to cancel the contract if it so desired. On the other hand, since defendant did not cancel the contract and at all times indicated that it would take additional bottles, the Court feels that plaintiff could reasonably have on hand a three weeks' supply of cases.

There is one other factor which leads the Court to deny plaintiff's claim for recovery as to the 24,914 cases. The total order included in the contract in question was for 30,000 gross bottles, which would have required 360,000 cases. Plaintiff's Exhibit 2(a) indicates that plaintiff or-

**514**

dered a total of 390,000 cases, that is, 30,000 more cases than would have been necessary to fill this contract. No explanation was given for this action by plaintiff, but the Court assumes that at least some of the cases were ordered for use in filling the order of May 6, 1953 (for 20,000 gross) that is not involved in the instant action.

In accordance with the foregoing, plaintiff is entitled to recover for the 53,086 cases it has on hand (after excluding the 24,914 cases) at its cost of $115.42 per thousand, making plaintiff's recovery $6,127.19, with interest to run from the date of the judgment herein. And since there was no evidence of the salvage value of the cases, the Court will include in its judgment an order requiring defendant to hold 53,086 cases for a period of 30 days, during which time defendant may, if it so desires, pay the judgment entered herein and take possession of said cases. If defendant does not take possession of the cases within 30 days plaintiff may dispose of said cases as it sees fit. The Court is including this order because the cases may have some value to defendant, whereas they are valueless to others. And by paying the judgment herein defendant in effect will be paying for the 53,086 cases, in which event defendant should be entitled to have said cases if it so desires.

Conclusions of Law

1.

The Court has jurisdiction of the parties to and the subject matter of this action.

2.

The defendant, Grapette Products Company, breached the contract involved herein.

3.

The evidence does not establish a novation or an accord and satisfaction between the parties.

4.

Plaintiff is entitled to recover of and from the defendant the sum of $6,127.-19. Upon payment of said amount with-

in 30 days, defendant will be entitled to possession of 53,086 cases now in the possession of plaintiff.

A judgment in accordance with the above should be entered.