UNITED STATES RUBBER COMPANY,
Plaintiff,

v.

H. Doyce PULLIAM, d/b/a Pulliam Tire
Service, Defendant.

Civ. A. No. 680.

United States District Court
W. D. Arkansas,
Hot Springs Division.

May 31, 1957.

Albert Graves, Hope, Ark., for plaintiff.

Lawson E. Glover, Malvern, Ark., R. Julian Glover, Hot Springs, Ark., for defendant.

JOHN E. MILLER, District Judge.

### Statement

This case was tried to the Court without a jury on May 1, 1957, and at the conclusion of the trial the Court took the case under advisement pending receipt of briefs of the parties in support of their respective contentions.

The briefs have been received, and the Court, having considered the pleadings, the evidence, and briefs of the parties, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

### Findings of Fact

1.

Plaintiff is a New Jersey corporation. The defendant, H. Doyce Pulliam, is a citizen of the State of Arkansas and resides in the City of Malvern, Arkansas. He is doing business under the name of Pulliam Tire Service. The amount in controversy, exclusive of interest and costs, exceeds the sum of $3,000.

**2.**

In 1952, the defendant began doing business with the plaintiff. The parties entered into a written agreement entitled "United States Distributor's Consignment Agreement". Each year a contract was entered into between the parties, the latest contract being dated January 1, 1955.

Among other things the agreement provided:

"1. The Consignor at the Consignor's option shall from time to time consign to the Consignee and the Consignee will receive, accept and/or hold, upon consignment, under the terms of this agreement, such shipments of the Consignor's United States brands of tires and tubes as shall be ordered from the Consignor by the Consignee or as may have heretofore been consigned to the Consignee by the Consignor under any other agreement and are now in the possession, custody or control of the Consignee. * * * Regardless of the foregoing, shipments by Consignor shall be made consistently with its capacity and ability to procure and deliver and the requirements of its other consignees, customers and agents, and the stock of goods consigned to the Consignee, shall never exceed in value the sum of Six Thousand and No/100 Dollars ($6,000) at the current 'Billing Prices' of the Consignor for any time being.

"2. The Consignee shall exercise due care in the housing, protecting and preserving of said goods as the Consignor's property, it being agreed that the title to such of said goods as at any given time shall have not been sold by the Consignee, and to the accounts receivable or the proceeds, as the case may be, from the sale of the remainder of such goods, shall always be vested in the Consignor, and such goods, accounts receivable and proceeds shall be at all times subject to and under the direction and control of the Consignor.

\* \* \* \* \*

"4. On the 25th day of each month the Consignee shall render to the Consignor an accurate account of the quantity and character of all goods sold and delivered by the Consignee during the period since the 25th day of the preceding month and on the 10th day of the following month (with respect to Heavy Service tires and tubes, on the 10th day of the second month following) shall pay to the Consignor out of the said proceeds on account of the sale of goods so sold, at the rates determined in paragraph 21 below, less 2% allowance for payments so made. * * *

\* \* \* \* \*

"7. The Consignee guarantees payment of all bills and accounts for goods sold by him under this agreement and hereby agrees that in case any goods delivered to him by the Consignor are not accounted for to the Consignor either in kind or by the payment specified in clause 4 of this agreement whether the inability to account for them has resulted from the Consignee's fault or not, he shall pay to the Consignor on account of such goods the amounts at which said goods shall have been last billed to the Consignee by memorandum invoice, and thereupon title to such goods or the accounts receivable theretofore or the proceeds thereof so paid for shall pass to the Consignee and shall be exempted from the provisions of this agreement. The Consignee shall not place or permit to be placed, any lien or encumbrance of any kind on said goods.

"8. * * * In addition to the foregoing events of termination, this agreement may be terminated by either party, irrespective of cause, upon the giving of thirty (30) days notice in writing to the other. \* \* \*

\* \* \* \* \*

"9. The expiration or termination of this agreement shall be without prejudice to the rights of the Consignor against the Consignee and shall not relieve the Consignee of any of his obligations or guarantees hereunder. Upon the expiration or termination for any reason of this agreement all of the indebtedness of the Consignee to the Consignor, however created, under this agreement or otherwise, shall immediately become due and payable and the Consignee will immediately deliver over to the Consignor or his representative or representatives all of the unsold consigned stock then in his custody and will perform all of his obligations to the Consignor then unfulfilled; but all or any part of the consigned merchandise then in the possession of the Consignee may, at the election of the Consignor remain in the place of business of the Consignee for a period not exceeding thirty (30) days, during which period it will be delivered to the authorized representative or representatives of the Consignor upon demand. Upon the demand of the Consignor at any time, whether or not this agreement has been terminated, the Consignee shall deliver all of the consigned stock then on hand to the representative or representatives of the Consignor. All merchandise so delivered shall be in as good condition as when delivered to the Consignee, ordinary stock usage excepted. If at any time the Consignee refuses to make such delivery the representative or representatives of the Consignor shall be entitled to enter the premises of the Consignee and take immediate possession of all consigned merchandise then in the possession of the Consignee by force if necessary, without being guilty of trespass in so doing. At the expiration or upon any termination of this agreement, the Consignee shall not be entitled to any commission or compensation of any nature with respect to merchandise of the Consignor then in the custody of the Consignee and not delivered or withdrawn from the consigned stock, nor for any services or expenses in connection therewith."

### 3.

The parties operated under these Consignment Agreements from 1952 until May 1955. The defendant's business was primarily that of a retail dealer in tires and related services. Defendant would order tires from plaintiff, and the tires would be shipped to him on consignment. On the 20th of each month defendant would take an inventory of the consigned merchandise on hand and send an inventory to plaintiff. Having the inventory figures and the figures on the amount of merchandise which had been ordered, plaintiff could then ascertain the amount of consigned merchandise that had been sold by defendant to his customers, and plaintiff would then charge that amount to defendant on an open account. Plaintiff carried these amounts on open account in order to save defendant the interest defendant would have been required to pay had he used bank or other financing.

In most cases the merchandise was sold by defendant to his customers on conditional sales contracts and defendant kept a record of his accounts receivable from his customers.

In addition to ordering merchandise on consignment, defendant also purchased some items from plaintiff on open account, including some special purchases of tires, tubes, batteries, etc. Defendant also purchased some items from others, such as tread rubber for recapping, wheel weights, repair material, used tires, etc.

A part of the services offered by defendant to his customers included recapping of tires, repair work on tires, and wheel balancing.

### 4.

As the parties continued to do business the balance owed by defendant to plaintiff on open account grew larger and

larger. The parties had several conferences, and finally on May 25, 1955, plaintiff decided to close out the consignment account. On that date, Charles R. McCallister, plaintiff's credit manager, went to defendant's place of business in Malvern, Arkansas, for the purpose of closing out the account. Most of the consigned merchandise in defendant's place of business was returned to plaintiff and defendant was given credit therefor. In addition to the consigned merchandise, $2,599.57 worth of other merchandise was returned to plaintiff and defendant was given credit therefor based on the defendant's cost price.

Plaintiff also took an assignment of defendant's accounts receivable in the total amount of $13,062.86. Of that amount $3,632.73 was for merchandise not covered by the Consignment Agreement.

With regard to the accounts receivable representing consigned merchandise, it was the understanding of McCallister that his company was taking an assignment of said accounts receivable in an effort to facilitate the collecting of said accounts. It was further his understanding that defendant would be given credit for all collections made by plaintiff, but not for the face amount of the accounts receivable. On the other hand, it was defendant's understanding that he would be given credit for the entire face amount of the accounts receivable regardless of whether or not plaintiff was successful in collecting them.

With regard to the accounts receivable in the sum of $3,632.73 based on merchandise not covered by the Consignment Agreement, both parties understood that the assignment of said accounts receivable was taken by plaintiff at full face value in part payment of the indebtedness owed by defendant to plaintiff.

At the time the accounts receivable were assigned to plaintiff, McCallister stated that the company would go to great lengths to collect the accounts. He said that the company would spend $100 to collect $1.

5.

Letters dated May 24, 1955, were mailed to defendant's customers advising them of the assignment of the accounts receivable to plaintiff, and requesting the customers to make their payments to the plaintiff at its address in Memphis, Tennessee.

After receiving the accounts receivable, plaintiff on June 3, 1955, through its credit manager, McCallister, wrote each of the customers listed on defendant's accounts receivable confirming the letters of May 24 and asking the customers' cooperation in forwarding payments to plaintiff in Memphis, Tennessee.

Further efforts were made by plaintiff to collect the accounts, and finally in September 1956 the accounts were turned over to C. G. Giles, Manager of the Credit Bureau in Malvern, Arkansas, for purposes of collection. By agreement of the parties the defendant has also continued to make some collections. At the time of the trial a total of $5,505.20 had been collected on the accounts receivable. Of that amount the defendant had collected $3,080.36; Giles had collected $650.32; and the plaintiff had collected the remainder. The collection costs for the accounts collected by Giles is 25 percent, and the plaintiff is bearing this cost.

Some additional collections have been made since the trial, and at the present time the total sum of $5,599.20 has been collected on the accounts receivable, of which amount the sum of $1,556.58 was collected on accounts receivable which were not based on merchandise covered by the Consignment Agreement.

6.

At the time the accounts receivable were assigned none of the accounts was over three years old. At the present time a few of the accounts are over three years old.

7.

In the summer of 1955, McCallister made another trip to Malvern, Arkansas, and had a discussion with the defend-

ant. It was at that time that the parties first learned that there was a misunderstanding about the credit to be allowed defendant for the accounts receivable.

The defendant has never asked for the return of the accounts receivable, and the plaintiff prior to this action had never offered to return them to defendant.

8.

It was not until January 11, 1956, that plaintiff sent defendant a formal cancellation notice. That notice was sent in order that the plaintiff could clear its books insofar as defendant's accounts were concerned.

9.

The amount due by defendant to plaintiff as of May 31, 1955, was $19,069.04. Additional charges in the amount of $906.38 were made in June 1955, making the total due $19,975.42. Defendant·was given a credit in the amount of $2,599.57 for merchandise returned to plaintiff on May 25, 1955, leaving a balance due of $17,375.85.

10.

On April 26, 1955, defendant prepared a Statement of Financial Condition as of the date of March 31, 1955 for the plaintiff. This statement listed assets in the amount of $62,564.95 and liabilities in the amount of $30,295.

Discussion

■ Defendant's first contention is that the contract between him and plaintiff was in effect a conditional sales contract and that the plaintiff, by taking an assignment of defendant's accounts receivable, elected its remedy and is foreclosed from suing on the debt. This contention is without merit for two reasons.

In the first place, the agreement clearly is a consignment rather than a conditional sales contract. And secondly, even if the agreement were a conditional sales contract, the rule urged by defendant would be inapplicable.

■ It is true that if a conditional seller repossesses property under a title-retaining contract, he cannot then pursue a second remedy of collecting on the debt. Noble Gill Pontiac, Inc., v. Bassett,

Vol. 101, Law Reporter No. 16, p. 634; Gale & Co. v. Wallace, 210 Ark. 161, 194 S.W.2d 881; McCain v. Fender, 188 Ark. 1139, 69 S.W.2d 867. But that rule applies only when the conditional seller retakes the *property*. In the instant case the property had already been sold by defendant to his customer, and the plaintiff did not retake that property.

■ The only thing taken by plaintiff was defendant's accounts receivable, and under paragraph 2 of the Consignment Agreement set out in Finding of Fact No. 2, plaintiff had the title to the accounts receivable based on consigned merchandise and the right to direct and control the same. In view of the provisions of the contract the Court is convinced that by taking an assignment of the accounts receivable (insofar as the consigned goods are concerned) the plaintiff did not lose its right to sue on the debt.

■ Defendant's next contention is that there was an accord and satisfaction as to the sum of $13,062.86, said sum being the amount of the accounts receivable assigned to plaintiff by defendant.

The following quotations set out the Arkansas law with regard to the affirmative defense of accord and satisfaction.

In Fleming v. Cooper, 225 Ark. 634, at page 642, 284 S.W.2d 857, at page 862, the court said:

"We think it is clear that no accord and satisfaction was had here. 'A discharge of claims by way of accord and satisfaction is dependent upon a contract, express or implied; and it follows that the essentials necessary to valid contracts generally must be present in a contract of accord and satisfaction. Therefore, the following elements are essential: (1) A proper subject-matter, (2) competent parties, (3) an assent or meeting of the minds of the parties, and (4) a consideration.' 1 Am.Jur., § 5, page 217.

"We think that in addition to the absence of meeting of the minds,

necessary to support an accord and satisfaction, there were also lacking competent parties."

See, also, Western Union Telegraph Co. v. Arkadelphia Milling Co., 156 Ark. 370, 376, 246 S.W. 482.

In Alexander H. Kerr & Co. v. Fooks, D.C.Ark., 145 F.Supp. 503, at page 510, the court said:

"In De Soto Life Insurance Co. v. Jeffett, 210 Ark. 371, 377, 196 S. W.2d 243, 246, the court said:

" 'It is held generally that the payment of a liquidated, undisputed, matured obligation does not furnish a consideration for the release of any additional obligation. In 1 C. J.S. Accord and Satisfaction § 29, it is said: "The payment of a sum admittedly due and payable furnishes no consideration for the discharge of an additional and distinct amount or item of liability, and does not effect an accord and satisfaction thereof." '

"And in McMillan v. Palmer, 198 Ark. 805, 812, 131 S.W.2d 943, 947, the court said:

" 'We summarize our conclusions as follows: In accord and satisfaction there are certain elements that must usually or ordinarily be considered. First, there is a disputed amount involved. Second, there is a consent to accept less than the claimed amount in settlement of the whole. In this case there was no dispute. There was an actual agreement upon the amount that should be paid.' "

In the instant case, two elements required for an accord and satisfaction are missing. First, there was no disputed amount, and second, there was no meeting of the minds of the parties.

As to the accounts receivable based on consigned merchandise, the Court is of the opinion that the plaintiff's credit manager, Charles R. McCallister, did not intend to and did not agree to give defendant full credit for the total amount of said accounts receivable regardless of whether they were collected. In this connection, there was absolutely no reason for him to make such an agreement since plaintiff, under its contract with defendant, already had a right to direct and control the accounts receivable.

On the other hand, the Court is also of the opinion that the defendant thought he would receive full credit for the total amount of said accounts receivable. Thus, there was no meeting of the minds and no accord and satisfaction as to the total amount of the accounts receivable, $13,062.86.

A different situation exists, however, with respect to his accounts receivable based upon merchandise not covered by the Consignment Agreement. Approximately 27.8 percent of the accounts receivable, amounting to $3,632.73, was not based on merchandise covered by the Consignment Agreement, and as to these accounts receivable the plaintiff had no ownership and no right of control. The Court is convinced that the plaintiff's credit manager, McCallister, in taking an assignment of this portion of the accounts receivable was accepting said accounts receivable at face value in part payment of the debt owed by defendant. In the absence of receiving full credit for these particular accounts receivable the defendant would have had no reason to assign said accounts to the plaintiff.

The one other item in controversy was a bonus of $88.57. This bonus was never earned by defendant, and under the provisions of paragraph 9 of the Consignment Agreement defendant is not entitled to a credit for said bonus.

The amount owed by defendant to plaintiff, after deduction of merchandise returned, etc., was $17,375.85. On that amount defendant is entitled to a credit of $3,632.73, representing the part payment by assignment of accounts receivable not related to consigned merchandise.

The total amount collected to date is $5,599.20, of which amount the sum of *$1,556.58* was collected on accounts receivable not related to consigned merchandise. Since plaintiff after the as-

signment owned these accounts receivable, defendant is not entitled to a credit for the amount of *$1,556.58* which was collected on said accounts. Defendant is entitled to a credit for the sum of *$4,042.62* which was collected on the accounts receivable representing consigned merchandise.

Therefore, on the total sum of $17,375.85 due, defendant is entitled to credit of $3,632.73, plus a credit of *$4,042.62*, leaving the net amount of *$9,700.50* due from defendant to plaintiff.

It is to the best interest of all concerned that every effort be made to collect the accounts receivable. As to the accounts receivable based on consigned merchandise, plaintiff under the Consignment Agreement has the right to control said accounts as long as defendant is indebted to it for the merchandise. Thus, at the present time, plaintiff has the right to keep these accounts and in good faith attempt to collect them, or plaintiff may return the accounts to defendant in order that defendant might attempt to collect them. However, if and when defendant pays plaintiff the amount of the indebtedness, then defendant will have an absolute right to the return of the accounts receivable.

With regard to the accounts receivable based on merchandise not covered by the Consignment Agreement, the Court has found that plaintiff accepted said accounts at their face value in part payment of the indebtedness, and therefore these accounts are now owned by it.

### Conclusions of Law

#### 1.

The Court has jurisdiction of the parties and the subject matter herein.

#### 2.

The defendant is indebted to plaintiff in the sum of *$9,700.50*, and plaintiff is entitled to a judgment against the defendant in that amount.

#### 3.

The defendant is directed to furnish plaintiff information indicating which of the accounts receivable were based on consigned merchandise and which of the accounts receivable were based on merchandise not covered by the Consignment Agreement. As to the latter accounts receivable which originally totaled $3,632.73, the plaintiff is the owner thereof and may dispose of the same as it sees fit. As to the accounts receivable based on consigned merchandise plaintiff is entitled to direct and control said accounts receivable until the judgment entered herein is paid by defendant. Upon the defendant's payment of said judgment, plaintiff is directed to return to defendant the remaining accounts receivable based on consigned merchandise.

A judgment in accordance with the above should be entered.